**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| **RENEE CASTANEDA,** | ) | |
| **Plaintiff,** | ) | **Civil Action No.** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **SAINT FRANCIS MEDICAL** | ) | |
| **CENTER, TORAX MEDICAL,** | ) | **JURY DEMAND** |
| **INC., ETHICON US, L.L.C.,** | ) | |
| **DR. RONALD RICHMOND, M.D.** | ) | |
| **and CAPE GIRARDEAU** | | |
| **SURGICAL CLINIC, INC. ,** | | |
| **Defendants.** | | |

## PLAINTIFF'S ORIGINAL COMPLAINT

COMES NOW Plaintiff, Renee R. Castaneda, who now files this, her Original Complaint, against Defendants Saint Francis Medical Center, Torax Medical, Inc., Ethicon US, L.L.C., Dr. Ronald Richmond, M.D., and Cape Girardeau Surgical Center, Inc., and respectfully states as follows:

### PRELIMINARY STATEMENT

In December of 2018, Plaintiff had surgery performed by Defendant Dr. Ronald Richmond, employed by Cape Girardeau Surgical Clinic, Inc. %, at Defendant Saint Francis Medical Center ("Saint Francis"), utilizing a defective medical device manufactured by Defendants Torax Medical, Inc. ("Torax") and Ethicon US, L.L.C. ("Ethicon"), such that Plaintiff suffered significant injury which continues to the present time. Here, a defectively manufactured LINX was surgically implanted in Plaintiff by Defendant Richmond to control

her gastroesophageal reflux disease (GERD). After the LINX was implanted in Plaintiff, Defendants Richmond and Saint Francis became aware that the surgery did not go according to plan, and that the device should not have been used on Plaintiff, and Defendants Torax and Ethicon were aware of the manufacturing defect in Plaintiff's LINX. Defendants Torax and Ethicon recalled Plaintiff's LINX as well as numerous other LINX devices in the United States and European Union.  Moreover, Defendants have admitted that Plaintiff's LINX was defectively manufactured.

Here, Plaintiff seeks to vindicate her rights at law for having to experience a severe recurrence of her GERD  symptoms, being unable to eat or swallow properly, permanent nerve damage, and having to undergo multiple invasive procedures and hospitalizations to fix what should have been corrected by the implantation of the LINX.

## PARTIES

1. Plaintiff Renee R. Castaneda is a resident of the State of Illinois.

2. Defendant Saint Francis Medical Center is a Missouri nonprofit corporation with its principal place of business in Cape Girardeau, Missouri. It may be served through its registered agent, James L. Burke, 211 Saint Francis Drive, Cape Girardeau, Missouri 63703, or wherever he may be found.

3. Defendant Torax Medical, Inc. ("Torax") is a Delaware corporation with its headquarters and principal place of business in Shoreview, Missouri. Torax may be served with process through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801 or through its president, Todd Berg, 4188 Lexington Ave., Shoreview, MN 55126, or wherever he may be found. While headquartered in Missouri, Torax's medical devices, including the LINX, are

distributed, marketed, sold, and used on patients in all 50 United States, including Missouri – where the device was implanted into Plaintiff –, and the European Union. Therefore, Torax is subject to personal jurisdiction in the State of Missouri.

4. Ethicon US, L.L.C. (Ethicon) is a Texas corporation with its headquarters and principal place of business in the State of Ohio. Ethicon may be served with process through its registered agent, CT Corporation System, 1300 E. 9th St., Cleveland, OH 44114, or its president Timothy H. Schmid, Ethicon US, LLC, 4545 Creek Road, Cincinnati, OH 45242, or wherever he may be found. While headquartered in Ohio, Ethicon's medical devices, including the LINX, are distributed, marketed, sold, and used on patients in all fifty United States, including Missouri – where the device was implanted into Plaintiff – and the European Union. Therefore, Ethicon is subject to personal jurisdiction in the State of Missouri.

5. Defendant Dr. Ronald Richmond, M.D., is an individual believed to be a resident of the State of Missouri who had credentials to perform surgery at Saint Francis Medical Center in Cape Girardeau, Missouri.

6. Defendant Cape Girardeau Surgical Clinic, Inc. % ("CGSC") is a Missouri corporation who may be served through its President and registered agent, Jonathon K. Foley, 60 Doctor's Park, Cape Girardeau, Missouri, 63703.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1332(a)(1). The amount in controversy exceeds $ 75,000.00.

8. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(1) and (2). The relevant events applicable to this action occurred in this jurisdiction.

## FACTS APPLICABLE TO ALL COUNTS

### A.  Malpractice

9.  On November 8, 2018, Defendant Dr. Richmond, a general surgeon who is not a gastrointestinal specialist, saw Plaintiff in his office at CGSC for a diagnosis of a hiatal hernia.

10. During this visit, he evaluated her for the implant of the "LINX Reflux Management System" ("LINX") medical device due to severe acid reflux and her inability to keep food down without regurgitating it.

11. He further indicated that she was a candidate for repair of the hiatal hernia, possible LINX implantation, possible Nissen fundoplication.

12. Dr. Richmond indicates in his notes that he advised Plaintiff of risks of the procedure, including possible removal or erosion of the device, but that "most people are able to be off of medical therapy" and that "the durability of the device appears to exceed that of a tissue repair."

13. On December 4, 2018, at Saint Francis, Dr. Richmond performed a hiatal repair, LINX implantation and an endoscopic gastroduodenoscopy ("EGD"). He noted no complications at that time.

14. However, the very next day, on December 5, 2018, Plaintiff was admitted to Saint Francis for post-operative pain.  She was indicated to be "code blue" and was intubated. It was anticipated that she was discharged as soon as her pain was under control.

15. She was eventually discharged but again called Defendant Richmond at CGSC on December 12 or 13th, 2018, where she spoke to their nurse, "Courtney," and told her she was still having issues with not being able to have a bowel movement.

16. Plaintiff was bloated, nauseous and was only eating small amounts of food.

17. "Courtney" stated that it was normal for her to be experiencing these post-operative issues and that she should start to take medicine to help her go to the restroom. Plaintiff then began taking laxatives and suppositories once a day to try to relieve the bloating and have bowel movement, to no avail.

18. Plaintiff was again seen at Defendant CGSC on December 20, 2018. While there, Defendant Richmond discussed the same issues she had been having since after the surgery. Defendant Richmond stated that she "must be one of those individuals who take longer to heal and adjust." He prescribed Reglan and MIRLAX for her and told her to keep taking the other stool softeners in addition to these two new medications.

19. On Dec 25, 2018 – Christmas Day – Plaintiff went to the emergency room at SIH in Carbondale, Illinois, complaining of stomach hurting back pain, bloating and no bowel movements.

20. SIH staff conducted a CAT scan and, upon information and belief, found that she had an enlarged stomach and sent her home.

21. Plaintiff continued to suffer in pain, all the while being told that this was normal for people following LINX surgery.

22. Plaintiff attempted to return back to work on January 7, 2018, but she found herself tiring out quickly and did not feel well. She also suffered from shortness of breath just walking from her car to the office building, and she had trouble sitting for long periods.

23. On January 8, 2010, upon feeling more sick to her stomach, unable to keep food down, and continuing to have nausea and bloating, Plaintiff called Defendant CGSC's office after hours to see if Defendant Richmond was on-call. She left a message to see if she could be seen by him the next morning.

24. At 3 a.m. the following morning, Plaintiff awoke vomiting blood.

25. After not hearing from Defendants Richmond or anyone from CGSC, Plaintiff called them at 8:30 am to see if she could see Defendant Richmond in the office. Upon hearing her symptoms, Plaintiff was told to come into the office as soon as possible

26. Plaintiff was driven to Defendant CGSC's office by her daughter. When Defendant Richmond opened the door, Plaintiff was vomiting blood. He advised her that she did not look good and even appeared "worse."

27. Plaintiff's daughter inquired of Defendant Richmond if there could be any vagus nerve damage, to which he stated that it was not, that such damage rarely happens, and that he did not recall any complications with her during surgery.

28. Defendant Richmond advised that he was going to have her do a series of tests and refer her to a local gastrointestinal ("GI") specialist.

29. The following day, Plaintiff underwent a stomach emptying test.

30. Plaintiff continued to have nausea and called Defendant CGSC to ask for additional medications but was unable to obtain this medicine for two days due to it not being sent in by Defendant's nurse.

31. On January 14, 2019, Plaintiff had further imaging studies done which indicated that she was retaining food in her stomach.

32. Eventually, Plaintiff returned to Saint Francis to meet with a GI specialist on January 16, 2019, because she was still experiencing extreme nausea and vomiting.

33. He showed Plaintiff pictures of food that he indicated had been sitting in her stomach, undigested, for fourteen days. He further indicated that he believed she had vagus nerve damage and was referred her to another GI specialist in St. Louis, Missouri.  He also indicated to Plaintiff's daughter that he was going to advise Defendant Richmond to let him know his finding.

34. On this same date, upon observation of gastroparesis and "gastric debris" and a diagnosis of distal esophagitis, Plaintiff underwent another EGD with injection of Botox along with pyloroplasty, a surgery performed to widen the opening at the lower part of the stomach as it was difficult for food to pass through her stomach.

35. For several days following this procedure, Plaintiff's condition continued to deteriorate. She was not only vomiting blood but she could not eat at all and felt that she was becoming delirious, as she could not remember her address or date of birth.

36. Plaintiff's daughter drove her several hours to Barnes Jewish Hospital in St. Louis because she was concerned that her mother was not receiving proper treatment in Cape Girardeau.

37. Within hours of arriving at Barnes, Plaintiff was told that she needed to have her stomach pumped using a nasal tube to remove the food that remained, also known as a gastric lavage using a nasogastric tube. She was advised that this was an emergency procedure that was being done because she was at risk of death.

38. Plaintiff spent three days hospitalized at Barnes and was sent home with a liquid diet until further notice.

39. Plaintiff returned to St. Louis on January 31, 2020 for an office visit. She ate no food at this time and was still on a liquid diet, experiencing less vomiting and occasional nausea but having extreme hunger.

40. Plaintiff continued to have trouble completing daily activities, which including having a hard time walking too much due to shortness of breath and becoming fatigued.

41. The physician felt that Plaintiff could begin eating pureed food and ordered her to return for another scope and colonoscopy on February 5, 2020 with a GI specialist in St. Louis.

42. However, before I she could have those tests done, she had to have an esophageal manometry, to measure the function of her esophagus. This test also had to be completed in St. Louis. When she awoke from having the test, she was told that the additional tests could not be done due to her still having undigested food in her stomach.

43. The following day, Plaintiff and her daughter met with the St. Louis GI specialist to go over the results of the testing she had undergone, and she was advised that she had suffered vagus nerve damage from the LINX procedure, and that now her esophagus was not functioning properly, either. The specialist stated that there was no cure for this and that she would have to remain on a liquid diet in order to decrease her issues.

44. Plaintiff continues to suffer to the present day from the injuries sustained as a result of the actions taken by Defendants Richmond, CGSC and Saint Francis, which include emotional damage due to depression from not being able to live a normal life.

**B. Product Defect**

45. This case arises, in part, from the defective manufacturing by Defendants Torax and Ethicon of a medical device known as the "LINX Reflux Management System" ("LINX"). LINX is a titanium bead-and-wire ring surgically implanted around a patient's lower

esophageal sphincter (LES) to augment the LES and prevent acid reflux. These devices can only be implanted surgically, and they are used to treat gastroesophageal reflux disease (GERD).

46. The LINX required pre-market approval by the Food & Drug Administration prior to it being placed in the stream of commerce and used on patients in the United States and the European Union. Specifically, in December 2010, Defendant Torax applied for this pre-market approval, including its manufacturing process, and this approval was granted on March 22, 2012. The LINX is considered a "restricted" device, meaning it is subject to numerous FDA regulations regarding the manufacture, distribution, and marketing of the device.

47. Defendant Ethicon is the parent-corporation for Defendant Torax and participated in the manufacture, distribution, and post-market surveillance of the LINX.

48. On May 31, 2018, Defendant Torax initiated a recall of numerous LINX due to "an out of specification condition" which would allow "a bead component to separate from an adjacent wire link." This means that the LINX device, normally a continuous loop, would become discontinuous and open due to a defect resulting from improper manufacture.

49. Upon information and belief, a 15-bead LINX was surgically implanted in Plaintiff on December 4, 2018. This LINX was subject to the recall described in ¶ 48.

50. Plaintiff alleges that Defendants Torax and Ethicon manufactured the LINX which was implanted in Plaintiff and subsequently failed due to a manufacturing defect. Plaintiff alleges that Defendants Torax and Ethicon placed Plaintiff's LINX device into the stream of commerce. Plaintiff alleges that Defendants Torax and Ethicon are corporations who

regularly design, test, assembly, manufacture, sell, and distribute medical devices intended for human use.

## CAUSES OF ACTION

## COUNT I- NEGLIGENCE AS TO DEFENDANT RICHMOND AND DEFENDANT CGSC

51. Plaintiff incorporates by reference the above paragraphs as if fully contained herein.

52. Defendants Richmond and CGSC owed Plaintiff a duty to perform the December 4, 2018 surgery, and all subsequent care, on Plaintiff in a reasonable manner consistent with the standard of care.

53. That Defendants Richmond and CGSC deviated from this standard of care when Defendant Richmond negligently performed the December 4, 2018 surgery on Plaintiff, and negligently performed follow-up care, as indicated in the medical opinion to be supplied.

54. That additionally, Defendant CGSC negligently allowed Defendant Richmond to perform surgeries utilizing the LINX device – which had been recalled – and a procedure for which he was not qualified to perform as a general surgeon who was not a GI specialist.

55. That Plaintiff sustained physical and mental injuries, and said injuries were proximately caused by Defendant Richmond and CGSC's deviation from the standard of care.

56. WHEREFORE Plaintiff claims monetary damages against Defendants Richmond and CGSC in an amount to be determined at trial, plus costs, and for any further relief that this Honorable Court deems necessary and appropriate.

## COUNT II – NEGLIGENCE BY DEFENDANT SAINT FRANCIS

57. Plaintiff incorporates by reference the above paragraphs as if fully contained herein.

58. That during all of the times alleged herein that Plaintiff was receiving medical care and treatment at Saint Francis Medical Center through its agents, employees and staff, which includes Defendant Richmond.

59. Because Plaintiff received medical care and treatment at Saint Francis through its agents, employees and staff, Saint Francis had a duty to provide reasonable care and attention to Ms. Castaneda's safety, mental and physical condition, under the circumstances.

60. Saint Francis, through Defendant Richmond, its agents, employees and staff, breached that standard of care when it:

    a. Failed to ensure that Defendant Richmond utilized the proper surgical tools and devices in performing Plaintiff's surgery;

    b. Failed to properly train, ensure and/or verify that Defendant Richmond was properly trained on how to utilize the LINX device manufactured by Defendants in performing the December 4, 2018 surgery;

    c. Failed to observe and/or act on early post-operative signs which indicated the need for further monitoring and treatment including but not limited to the need to include surgical re-exploration;

    d. Credentialing of Defendant Richmond, a general surgeon, to perform procedures with the LINX device, when he is not a GI specialist; and

    e. Continuing to allow surgeons to use the LINX device even though it had been recalled.

61. Saint Francis' breach of the applicable standard of care, through its agents, employees and staff, was the proximate of Plaintiff's damages set forth below.

62. As a direct and proximate result of Saint Francis' breach, through its agents, employees and staff, Ms. Castaneda suffered pain, bleeding, disability, the inability to lead a normal life including eating food, additional surgeries, and mental anguish resulting in injuries.

63. WHEREFORE Plaintiff claims monetary damages against Defendant Saint Francis in an amount to be determined at trial, plus costs, and for any further relief that this Honorable Court deems necessary and appropriate.

## COUNT III - MANUFACTURING DEFECT AS TO DEFENDANT TORAX – STRICT LIABILITY

64. Plaintiff incorporates the above paragraphs and would show the Court that she is entitled to recover from, in strict liability for product defect, from Defendant Torax for the defective manufacture of the LINX device surgically-implanted in Plaintiff.

65. Specifically, the LINX implanted in Plaintiff was manufactured in violation of the Federal Food, Drug, and Cosmetic Act, the Medical Device Amendments, and federal regulations promulgated under these laws and administered by the FDA. The device implanted in Plaintiff was manufactured in deviation from the manufacturing specifications approved by the FDA and provided by Defendant Torax for its pre-market approval. Plaintiff's LINX was also manufactured in deviation of Current Good Manufacturing Practice requirements. The LINX was also defectively manufactured in violation of Missouri law that parallels federal requirements.

66. Specifically, Defendant Torax was required to manufacture the defective LINX device according to Federal Regulations, including but not limited to the following, and failed to do so in:

a. 21 CFR 820.5 – failure to establish and adhere to a quality system to prevent the manufacture of defective LINX;

b. 21 CFR 820.20 – failure to adhere to approved quality system procedures;

c. 21 CFR 820.70(a),(g), (h), (i) – failure to control production processes to ensure device conformance with specifications;

d. 21 CFR 820.72 – failure to inspect, measure, and test manufacturing equipment and materials such that the LINX was defectively manufactured;

e. 21 CFR 820.75 – failure to adhere to process validation and implement process validation such that the LINX was placed in the stream of commerce in a defective condition;

f. 21 CFR 820.90 – failure to prevent non-conforming product, e.g. Plaintiff's LINX, from entering the stream of commerce in a defective condition;

g. 21 CFR 820.100 – failure to implement corrective processes and preventative actions due to nonconformities.

67. As a result of Defendant Torax's violations of federal regulation, approved- manufacturing process, and manufacturing standard of care, Plaintiff's LINX was defectively manufactured and failed as a result of that defect. At the time the LINX device left the control of Defendant Torax, it was outside of manufacturing specification and was unreasonably dangerous due to its defective manufacture.

68. Each of the foregoing violations, whether taken singularly or in any combination, were a proximate cause of Plaintiff's injuries and damages which are described in more detail above and below. Plaintiff seeks compensatory damages, jointly and severally.

## COUNT IV - MANUFACTURING DEFECT AS TO DEFENDANT TORAX – NEGLIGENCE

69. Plaintiff incorporates the above paragraphs and would show the Court that she is entitled to recover from Defendant Torax for the defective manufacture of the LINX device surgically-implanted in Plaintiff.

70. Specifically, Defendant Torax owed Plaintiff a duty of ordinary care as would a reasonable and prudent manufacturer of medical devices to manufacture the LINX such that it would be safe for its intended use. Plaintiff alleges that Defendant Torax failed to use ordinary care by various acts and omissions, which constitute negligence, in at least the following ways:

   a. Failure to manufacture the LINX consistent with approved manufacturing standards such that it was defective and unreasonably dangerous for its intended use;

   b. Failure to manufacture the LINX consistent with approved design such that it was defective and unreasonably dangerous for its intended use;

   c. Failure to test and inspect the device prior to placing it in the stream of commerce in a defective and unreasonably dangerous condition; and

   d. Failure to prevent the defectively manufactured device from entering the stream of commerce in a defective and unreasonably dangerous condition.

71. As a result of Defendant Torax's breach of its duty of care, Plaintiff's LINX was defectively manufactured and failed as a result of that defect. At the time the LINX device left the control of Defendant Torax, it was outside of manufacturing specification and was unreasonably dangerous due to its defective manufacture.

72. Each of the foregoing violations, whether taken singularly or in any combination, were a proximate cause of Plaintiff's injuries and damages which are described in more detail above and below. Plaintiff seeks compensatory damages, jointly and severally.

## COUNT V - MANUFACTURING DEFECT AS TO DEFENDANT TORAX – NEGLIGENCE PER SE

73. Plaintiff incorporates the above paragraphs and would show the Court that she is entitled to recover from, in negligence per se, from Defendant Torax for the defective manufacture of the LINX device surgically-implanted in Plaintiff.

74. Specifically, the LINX implanted in Plaintiff was manufactured in violation of the Federal Food, Drug, and Cosmetic Act, the Medical Device Amendments, and federal regulations promulgated under these laws and administered by the FDA. The device implanted in Plaintiff was manufactured in deviation from the manufacturing specifications approved by the FDA and provided by Defendant Torax for its pre-market approval. Plaintiff's LINX was also manufactured in deviation of Current Good Manufacturing Practice requirements. The LINX was also defectively manufactured in violation of Missouri law that parallels federal requirements.

75. Specifically, Defendant Torax was required to manufacture the defective LINX device according to Federal Regulations, including but not limited to the following, and failed to do so in:

   a. 21 CFR 820.5 – failure to establish and adhere to a quality system to prevent the manufacture of defective LINX;

   b. 21 CFR 820.20 – failure to adhere to approved quality system procedures;

    c.  21 CFR 820.70(a),(g), (h), (i) – failure to control production processes to ensure device conformance with specifications;

    d.  21 CFR 820.72 – failure to inspect, measure, and test manufacturing equipment and materials such that the LINX was defectively manufactured;

    e.  21 CFR 820.75 – failure to adhere to process validation and implement process validation such that the LINX was placed in the stream of commerce in a defective condition;

    f.  21 CFR 820.90 – failure to prevent non-conforming product, e.g. Plaintiff's LINX, from entering the stream of commerce in a defective condition;

    g.  21 CFR 820.100 – failure to implement corrective processes and preventative actions due to nonconformities.

76. These violations constitute negligence per se.

77. As a result of Defendant Torax's violations of federal regulation, approved- manufacturing process, and manufacturing standard of care, Plaintiff's LINX was defectively manufactured and failed as a result of that defect. At the time the LINX device left the control of Defendant Torax, it was outside of manufacturing specification and was unreasonably dangerous due to its defective manufacture.

78. Each of the foregoing violations, whether taken singularly or in any combination, were a proximate cause of Plaintiff's injuries and damages which are described in more detail above and below. Plaintiff seeks compensatory damages, jointly and severally.

## COUNT VI - MANUFACTURING DEFECT AS TO DEFENDANT ETHICON – STRICT LIABILITY

79. Plaintiff incorporates the above paragraphs and would show the Court that she is entitled to recover from, in strict liability for product defect, from Defendant Ethicon for the defective manufacture of the LINX device surgically-implanted in Plaintiff.

80. Specifically, the LINX implanted in Plaintiff was manufactured in violation of the Federal Food, Drug, and Cosmetic Act, the Medical Device Amendments, and federal regulations promulgated under these laws and administered by the FDA. The device implanted in Plaintiff was manufactured in deviation from the manufacturing specifications approved by the FDA. Plaintiff's LINX was also manufactured in deviation of Current Good Manufacturing Practice requirements. The LINX was also defectively manufactured in violation of Missouri law that parallels federal requirements.

81. Specifically, Defendant Ethicon was required to manufacture the defective LINX device according to Federal Regulations, including but not limited to the following, and failed to do so in:

    a. 21 CFR 820.5 – failure to establish and adhere to a quality system to prevent the manufacture of defective LINX;

    b. 21 CFR 820.20 – failure to adhere to approved quality system procedures;

    c. 21 CFR 820.70(a),(g), (h), (i) – failure to control production processes to ensure device conformance with specifications;

    d. 21 CFR 820.72 – failure to inspect, measure, and test manufacturing equipment and materials such that the LINX was defectively manufactured;

e.  21 CFR 820.75 – failure to adhere to process validation and implement process validation such that the LINX was placed in the stream of commerce in a defective condition;

f.  21 CFR 820.90 – failure to prevent non-conforming product, e.g. Plaintiff's LINX, from entering the stream of commerce in a defective condition;

g.  21 CFR 820.100 – failure to implement corrective processes and preventative actions due to nonconformities.

82. As a result of Defendant Ethicon's violations of federal regulation, approved-manufacturing process, and manufacturing standard of care, Plaintiff's LINX was defectively manufactured and failed as a result of that defect. At the time the LINX device left the control of Defendant Ethicon, it was outside of manufacturing specification and was unreasonably dangerous due to its defective manufacture.

83. Each of the foregoing violations, whether taken singularly or in any combination, were a proximate cause of Plaintiff's injuries and damages which are described in more detail above and below. Plaintiff seeks compensatory damages, jointly and severally.


## COUNT VII - MANUFACTURING DEFECT AS TO DEFENDANT ETHICON – NEGLIGENCE

84. Plaintiff incorporates the above paragraphs and would show the Court that she is entitled to recover from Defendant Ethicon for the defective manufacture of the LINX device surgically-implanted in Plaintiff.

85. Specifically, Defendant Ethicon owed Plaintiff a duty of ordinary care as would a reasonable and prudent manufacturer of medical devices to manufacture the LINX such that

it would be safe for its intended use. Plaintiff alleges that Defendant Ethicon failed to use ordinary care by various acts and omissions, which constitute negligence, in at least the following ways:

    a.  Failure to manufacture the LINX consistent with approved manufacturing standards such that it was defective and unreasonably dangerous for its intended use;

    b.  Failure to manufacture the LINX consistent with approved design such that it was defective and unreasonably dangerous for its intended use;

    c.  Failure to test and inspect the device prior to placing it in the stream of commerce in a defective and unreasonably dangerous condition; and

    d.  Failure to prevent the defectively manufactured device from entering the stream of commerce in a defective and unreasonably dangerous condition.

86. As a result of Defendant Ethicon's breach of its duty of care, Plaintiff's LINX was defectively manufactured and failed as a result of that defect. At the time the LINX device left the control of Defendant Ethicon, it was outside of manufacturing specification and was unreasonably dangerous due to its defective manufacture.

87. Each of the foregoing violations, whether taken singularly or in any combination, were a proximate cause of Plaintiff's injuries and damages which are described in more detail above and below. Plaintiff seeks compensatory damages, jointly and severally.

## COUNT VII - MANUFACTURING DEFECT AS TO DEFENDANT ETHICON – NEGLIGENCE PER SE

88. Plaintiff incorporates the above paragraphs and would show the Court that she is entitled to recover from, in negligence per se, from Defendant Ethicon for the defective manufacture of the LINX device surgically-implanted in Plaintiff.

89. Specifically, the LINX implanted in Plaintiff was manufactured in violation of the Federal Food, Drug, and Cosmetic Act, the Medical Device Amendments, and federal regulations promulgated under these laws and administered by the FDA. The device implanted in Plaintiff was manufactured in deviation from the manufacturing specifications approved by the FDA. Plaintiff's LINX was also manufactured in deviation of Current Good Manufacturing Practice requirements. The LINX was also defectively manufactured in violation of Missouri law that parallels federal requirements.

90. Specifically, Defendant Ethicon was required to manufacture the defective LINX device according to Federal Regulations, including but not limited to the following, and failed to do so in:

   a. 21 CFR 820.5 – failure to establish and adhere to a quality system to prevent the manufacture of defective LINX;

   b. 21 CFR 820.20 – failure to adhere to approved quality system procedures;

   c. 21 CFR 820.70(a),(g), (h), (i) – failure to control production processes to ensure device conformance with specifications;

   d. 21 CFR 820.72 – failure to inspect, measure, and test manufacturing equipment and materials such that the LINX was defectively manufactured;

   e. 21 CFR 820.75 – failure to adhere to process validation and implement process validation such that the LINX was placed in the stream of commerce in a defective condition;

   f. 21 CFR 820.90 – failure to prevent non-conforming product, e.g. Plaintiff's LINX, from entering the stream of commerce in a defective condition;

20

g.  21 CFR 820.100 – failure to implement corrective processes and preventative actions due to nonconformities.

91. These violations constitute negligence per se.

92. As a result of Defendant Ethicon's violations of federal regulation, approved-manufacturing process, and manufacturing standard of care, Plaintiff's LINX was defectively manufactured and failed as a result of that defect. At the time the LINX device left the control of Defendant Ethicon, it was outside of manufacturing specification and was unreasonably dangerous due to its defective manufacture.

93. Each of the foregoing violations, whether taken singularly or in any combination, were a proximate cause of Plaintiff's injuries and damages which are described in more detail above and below. Plaintiff seeks compensatory damages, jointly and severally.

### DAMAGES

94. Plaintiff suffered, as a proximate and direct result of the wrongful actions and/or omissions of the Defendants in this matter, each of the following damages:

a.  Reasonable medical care and expenses in the past. These expenses were incurred by the Plaintiff for the necessary care and treatment of the injuries resulting from the manufacturing defect alleged and such charges are reasonable and were usual and customary charges for such services;

b.  Reasonable and necessary medical care and expenses which will in all reasonable probability be incurred in the future;

c.  Physical pain and suffering in the past;

d.  Physical pain and suffering which will in all reasonable probability be suffered in the future;

e.  Mental anguish sustained in the past;

f.  Mental anguish that, in reasonable probability, Plaintiff will sustain in the future;

g.  Physical impairment in the past;

h.  Physical impairment which, in all reasonable probability, will be suffered in the future;

i.  Disfigurement; and

j.  Costs of Court.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff makes her demand for trial by jury on all issues so triable.

## PRAYER FOR RELIEF

Plaintiff request that the Court award her the following relief against the Defendants above as may be appropriate:

1.  A Judgment awarding actual, compensatory, damages in the amount of not less $1,000,000.00;

2.  Costs of court;

3.  Pre- and post-judgment interest at the highest legal rate allowed by law from the earliest time allowed by law; and

4.  All other relief to which Plaintiff is justly entitled.

Respectfully Submitted,

/s/ Carla D. Aikens
Carla D. Aikens, 6296269
Attorney for Plaintiff
Date: December 3, 2020          Carla D. Aikens, P.C.
615 Griswold Street, Suite 709
Detroit, MI 48226
(844) 835-2993
carla@aikenslawfirm.com
***Pro Hac Vice Pending***